[Civ. No. 20418. Fourth Dist., Div. Two. June 10, 1980.]

MARTHA WAITE, Plaintiff and Respondent, v.
GEORGE W. GODFREY et al., Defendants and Appellants.

**COUNSEL**

Ruston & Nance and Terry L. Sorensen for Defendants and Appellants.

Richard B. Goethals, Donald R. Worley and Phillip R. Marrone as Amici Curiae on behalf of Defendants and Appellants.

Norbert R. Bunt and Prenner & Bunt for Plaintiff and Respondent.

Robert E. Cartwright, Edward I. Pollock, Stephen I. Zetterberg, Richard Bridgman, Arne Werchick, Ralph D. Drayton, Harvey R. Levine, Ian Herzog, Glen T. Bashore and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**McDANIEL, J.**—The petition for rehearing was granted in this case because of the representation by plaintiff's counsel that he had not received notice of the calendaring of oral argument and therefore had been foreclosed from the opportunity to present such argument.

After hearing plaintiff's argument and considering otherwise the petition for rehearing, we find no reason to change the opinion and decision heretofore filed. We therefore reissue the opinion.

The principal issue we are called upon to resolve on this appeal is whether uninsured motorist proceeds, received by plaintiff because of injuries caused by a hit-and-run driver, should be characterized as coming from a *collateral source* and hence not available as a setoff to the defendants involved in the same collision as joint tortfeasors.

Plaintiff sustained personal injuries and damage to her automobile as the result of a multicar, low speed, chain-reaction type collision on the transition ramp leading from the northbound Newport (now designated Costa Mesa) Freeway onto the westbound Santa Ana Freeway in Orange County. Plaintiff's vehicle, while stopped, was rearended by another driven by Russell Williams. Williams had just an instant before been rearended by defendant Godfrey's vehicle rented from defendant Dollar-A-Day Rent-A-Car. The Williams' vehicle was catapulted forward into plaintiff's by the force of the impact received from Godfrey's.

Defendant Godfrey testified at trial that he collided with Williams' vehicle because his had been rearended by one which had fled the scene after the accident. According to defendant Godfrey, traffic on the transition ramp was proceeding at a stop-and-go pace and, upon entering the ramp, he observed immediately behind him an older model Jaguar convertible, dark in color. The Jaguar, while remaining behind defendant Godfrey, repeatedly gunned its engine. Just before the collision under litigation, defendant Godfrey observed Williams' vehicle moving forward, and defendant Godfrey began to move his forward as well, maintaining a safe interval between the two. Seconds thereafter, he heard the Jaguar's tires screech and felt a rear impact, which he stated propelled him forward into a collision with Williams' vehicle. As noted, Williams' then struck plaintiff's.

With reference to her damages, plaintiff offered evidence that she suffered severe neck and back injuries as a result of the collision. As a consequence, she claimed that she was unable to work for approximately two years and incurred significant medical expenses.

After a jury trial, a verdict was returned for plaintiff awarding her $20,000 in damages. Thereafter, defendants moved for a new trial which the trial court denied. Defendants appealed.

In their attack on the judgment, the defendants make multiple assignments of error. The key issue recited at the outset is raised by the only contention having merit, and so we need not discuss the others except to note that: (1) there was no error in the admission of opinion testimony by plaintiff about her own physical condition which she claimed had caused her to miss 24 months of work; (2) it was error to admit into evidence certain unrelated medical bills, but any error was not prejudicial because the amounts involved were so small that they could not have had any real influence on the verdict; and (3) there was no error in refusing to instruct on plaintiff's contributory negligence, for, as a matter of law, there was no evidence of any negligent behavior by the plaintiff.

That brings us to the main issue of the case. Because the Jaguar driver fled from the scene of the collision and because plaintiff was able to show to the satisfaction of Nationwide Insurance Company, her own auto insurance carrier, that the hit-and-run driver, whose identity remained unknown, was responsible for her injuries, she received $12,000 in settlement of a claim made under her uninsured motorist coverage. (Ins. Code, § 11580.2, subd. (b).) Otherwise, and also because the identity of the Jaguar driver remained unknown, neither plaintiff nor defendants were able to join that driver as a party to this litigation.

The record discloses that on the first day of trial a hearing was had in chambers where a motion *in limine* was made, seeking a ruling that defendants were entitled, as a matter of law, to setoff against any adverse judgment the $12,000 paid in settlement of plaintiff's uninsured motorist claim. The trial court granted defendants' motion, conditioning its ruling on defendants' agreement not to argue to the jury the comparative fault of the nonjoined tortfeasor, i.e., of the Jaguar driver. In making that ruling the trial court observed: "...if you asked the jury to consider the proportionate shares of negligence of any other of the tort-

feasors who are not parties to this action and are successful in reducing your own client's liability as a tortfeasor on a percentage basis, it is plaintiff's position that you are then not entitled to ask the Court for a set-off. Conversely, if you try the case to the jury and do not ask that the negligence of the other tortfeasors be evaluated for the purpose of establishing comparative negligence on a percentage basis, this would then mean that you would be trying your case to the jury on the theory that your client is either not negligent at all or is negligent alone or may be negligent in a proportion with the negligence of the plaintiff, but that the negligence of any other party would not be weighed. If you try your case that way and a judgment should be rendered adverse to your client, then your client would be entitled to claim set-off."[1]

Defendants, to assure their entitlement to the setoff, agreed to withhold arguing to the jury the comparative negligence of the Jaguar driver, and the case was tried in this mode.

At the conclusion of the trial, the jury brought in a verdict of $20,000 for the plaintiff. Thereupon, the trial court reversed its earlier ruling on the motion *in limine* and declined to allow the setoff of $12,000. Defendants then made a motion for a new trial, arguing that "[b]y reversing its position on the set-off issue the court effectively precluded defendants from obtaining a jury finding as to the proportion of fault attributable to a non-party tortfeasor so as to provide the basis for an action for partial equitable indemnity against that tortfeasor[.]" They purported to base such an argument on the landmark decision in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], but their motion was denied.

Parenthetically, we note that defendants assign error as to this ruling also. Again, we comment only briefly that there was no error as assigned for the reason that defendants were and remain severally liable for the *full* amount of the judgment vis-à-vis the plaintiff regardless of any right to have liability apportioned among joint tortfeasors under the holding in *American Motorcycle.*

---

[1]We do not understand the reasoning seemingly implicit in the court's comments, for regardless of any so-called comparative fault which might have been attributed to the Jaguar driver, the defendants would each remain 100 percent answerable to the plaintiff. Nevertheless, under the court's ruling on the motion *in limine*, the defendants *were* accorded on a condition subsequent the right to setoff the $12,000, whatever the reasons. Moreover, they fully complied with the condition.

We come back then to the central issue, and that is whether the trial court properly refused to allow a setoff against the jury's verdict of the uninsured motorist proceeds received by plaintiff before the trial. As to this ruling by the trial court, the defendants contend, in assigning error, "that the failure of the trial court to reduce the judgment to reflect [plaintiff's receipt of] the $12,000.00 uninsured motorist settlement was legal error which substantially increased the judgment entered against defendants and prevented them from receiving a fair trial." This exception then presents the question of whether uninsured motorist proceeds should be characterized as a *collateral source*, as that designation is understood and as the rule was applied in *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 1, 77 A.L.R.3d 398], and cases which have followed it, and hence should be unavailable to defendants as a setoff against the jury verdict. We regard this as an open question by reason of the language of footnote 3 in *Helfend* which states, "[t]here are many sorts of collateral sources and a great variety of contexts in which the 'rule' might be applied. We expressly do not consider or determine the appropriateness of the rule's application in the myriad of possible situations which we have not discussed or which are not presented by the facts of this case." (*Id.* at p. 6.)

*Helfend*, a personal injury case, involved as here pertinent whether or not evidence of the receipt by plaintiff of payment for medical bills, based upon medical insurance coverage entirely independent of the tortfeasor, was rightly excluded when offered in mitigation of damages. In that case the Supreme Court ruled that the evidence was properly excluded and thus that the trial court was correct in applying the collateral source rule.

However, the precise problem confronting the *Helfend* court was whether the collateral source rule could be applied in a case involving a public entity defendant in view of its holding in *City of Salinas* v. *Souza & McCue Constr. Co.* (1967) 66 Cal.2d 217 [57 Cal.Rptr. 337, 424 P.2d 921]. As a consequence, our analysis more logically must reckon with the decision in *De Cruz* v. *Reid* (1968) 69 Cal.2d 217 [70 Cal.Rptr. 550, 444 P.2d 342], cited and relied upon in *Helfend* with reference to the collateral source rule as such.

*De Cruz* was an action for wrongful death, brought by the survivors of a deceased worker against third-party tortfeasors, which resulted in a

$40,000 verdict for the plaintiffs after exclusion of evidence that they had received $18,000 for a compromise and release from the decedent's workers' compensation carrier. The compromise and release had included a provision by which the carrier waived any right to subrogation.

On appeal, the principal contention of the defendant third-party tortfeasors was that, by excluding the evidence of the workers' compensation settlement, the trial court had countenanced a double recovery. More particularly, those defendants argued, invoking *Witt v. Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641], if for *any* reason the employer were not entitled to recoup compensation or death benefits paid to the employee or his survivors, that the latter, in any action against the third-party tortfeasor, may recover as damages *only* the excess over the amount of such compensation paid.[2]

The court in *De Cruz* rejected this argument. It pointed out first that *Witt* applied only where an employer was precluded from recovery because of his *own* concurrent negligence. On this point, the decision recited, "[i]n our view, the compensation benefits of which the nonnegligent employer has waived reimbursement, inure to the benefit of the injured employee or his dependents...as payments received by them from a collateral source." (*De Cruz v. Reid, supra,* 69 Cal.2d 217, 223.)

More importantly, in terms of our interest here, the court said, "'[w]here a person suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of the damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer....' (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198].)" (*Id.* at p. 223.)

From the commentary that follows in the text of the *De Cruz* opinion it conclusively appears that the collateral source rule applies in California[3] notwithstanding its lack of popularity in other jurisdictions (see fn.

---

[2]In *De Cruz*, as noted, the employer and his carrier were precluded from any such recovery by reason of the waiver in the compromise and release.

[3]We note, however, that since *Helfend* was decided the Legislature has seen fit to make limited inroads on the collateral source rule by enactment of section 3333.1 of the Civil Code.

6, *Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 7), and has been applied to payments received under a variety of situations. (For tabulation of such cases, see *De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 224.)

However, in rationalizing its decision with that in *Witt,* the *De Cruz* court was at pains to make clear that the limitation upon the employee recovery imposed in *Witt* applied only in cases of concurrent negligence by the employer. In so doing, it acknowledged the specific language in *Witt* that "the injured employee may not be allowed double recovery ..." (*Witt* v. *Jackson, supra,* 57 Cal.2d 57, 73), and then commented that "this language must be read in the factual context of a *concurrently negligent* employer. When so read, it is obvious that our above-quoted language is nothing more than a reference to the usual rule of law [applicable] in negligence actions generally, that a partial satisfaction of the liability by a *joint or concurrent tortfeasor* will result in a *pro tanto* reduction of the liability of the other tortfeasors. [Citations.]" (*De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 225-226; original italics.)

Carrying this latter observation in *De Cruz* over into our analysis of the issue, there was ample evidence in the record now before us to show concurrent negligence on the part of the Jaguar driver. Although there was no special finding of that fact made by the trial court, a de facto finding to that effect was obviously made by Nationwide, plaintiff's insurance carrier, as indicated by its payment of $12,000 in settlement of plaintiff's uninsured motorist claim.

Therefore, assuming, for purposes of argument, that the position of Nationwide here can be analogized to that of the compensation carrier in *De Cruz,* it can be fairly concluded, had the *De Cruz* court had this case before it and applied the reasoning noted above, that it would have held that defendants were entitled to the $12,000 setoff just as the third party defendants in *De Cruz* would have been held to be entitled to a setoff of the $18,000 had they been able to establish the concurrent negligence of the employer.

The last quoted observation from *De Cruz* and the foregoing analysis of its application in the similar situation supposed compels a recognition of the fundamental measure of damages in tort actions. ■ As noted by Witkin, "[i]n tort actions damages are normally awarded for the purpose of *compensating* the plaintiff for injury suffered, i.e., restoring him as nearly as possible to his former position, or giving him some pe-

cuniary equivalent. [Citations.]" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 842, p. 3137, original italics.) This principle finds equal application in cases involving multiple tortfeasors who are found to be jointly and severally liable for a single wrong. Only one complete satisfaction is possible, and, if partial satisfaction is received from one, the liability of the others will be correspondingly reduced. (*Laurenzi v. Vranizan* (1945) 25 Cal.2d 806 [155 P.2d 633].)

In *Laurenzi*, the case went up on appeal after the granting of a nonsuit. The Supreme Court reversed, and, anticipating a further trial, admonished that payment to plaintiff of $3,175 by one of the defendants in exchange for a covenant not to sue must be credited to any recovery against other tortfeasors. The court stated, "[s]ince the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover. [Citations.]" (*Id.* at p. 813.)

Actually, this concept is now embodied in section 877 of the Code of Civil Procedure which in pertinent part provides with reference to the release of one joint tortfeasor that such settlement "shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater..." Thus, if the Jaguar driver had been joined as a party defendant and if his liability carrier had settled with plaintiff for $12,000, there would be no question but what the $20,000 verdict against defendants would have had to be reduced by the amount of the settlement. This supposition suggests the policy question which lies at the heart of this appeal of why the defendants should fare differently merely because they had the chance ill fortune of having been involved with a joint tortfeasor whose own insurance coverage was nonexistent or at least was not available to fund the recovery.

By way of prologue to the analysis which we shall now pursue in resolving the policy question noted, it can be indicated that we view it as readily demonstrable that plaintiff's receipt of the uninsured motorist proceeds as damages for injuries caused by the concurrent fault of a second joint tortfeasor, i.e., the absent Jaguar driver, is a transaction much closer to one calling for the application of section 877 of the Code of Civil Procedure than it is to one involving the customary first-party payment to a plaintiff of special damage type items arising by reason of the fault of the first joint tortfeasor, i.e., defendant Godfrey.

Turning then to the announced rationale for the collateral source rule, *Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, tabulates those most widely relied on: (1) "The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. [Fn. omitted.] [In other words] the tortfeasor should not garner the benefits of his victim's providence" (*id.* at pp. 9-10); (2) "the plaintiff rarely actually receives full compensation for his injuries as computed by the jury. The collateral source rule partially serves to compensate for the attorney's share and does not actually render 'double recovery' for the plaintiff" (*id.* at p. 12); (3) "[t]he collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities" (*id.* at p. 10); (4) "[i]f we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit" (*id.* at p. 10); (5) "[d]efendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance" (*id* at p. 10); (6) "[i]nsurance policies increasingly provide for either subrogation or refund of benefits upon a tort recovery ...[h]ence, the plaintiff receives no double recovery" (*id.* at pp. 10-11); (7) "[t]o permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict. [Citations.]" (*Id.* at pp. 11-12.)

The mere recital of these reasons is persuasive of how inappropriate they are to general damage proceeds awarded for fault. Moreover, *Helfend,* as already noted, concedes that the collateral source rule is unpopular in some jurisdictions and that it might not be appropriate in a myriad of possible situations. Our inquiry then is whether the recited reasons for the rule logically justify the inclusion of uninsured motorist proceeds within its application. In other words, the crux of our task of analysis is to ascertain if the reasons comprising the *Helfend* rationale logically apply to uninsured motorist proceeds.

■ Section 11580.2 of the Insurance Code has established as a matter of public policy that every bodily injury motor vehicle liability insurance policy issued or delivered in California *shall* provide for unin-

sured motorist coverage. (*Hendricks* v. *Meritplan Ins. Co.* (1962) 205 Cal.App.2d 133, 136 [22 Cal.Rptr. 682].) Moreover, such coverage may only be deleted where the insured and the insurer agree in writing, using precisely prescribed statutory language to do so. (Ins. Code, § 11580.2, subd. (a).) The purpose of this mandatory coverage is to minimize losses to the drivers in California who are involved through no fault of their own in collisions with financially irresponsible and uninsured adverse drivers (*Mission Ins. Co.* v. *Brown* (1965) 63 Cal.2d 508, 510 [47 Cal.Rptr. 363, 407 P.2d 275]), and "[t]he effect of the statute [Ins. Code, § 11580.2] is to guarantee to an insured motorist the minimum financial responsibility of another motorist who has wrongfully inflicted personal injuries on him." (*Firemen's Ins. Co.* v. *Diskin* (1967) 255 Cal.App.2d 502, 505 [63 Cal.Rptr. 177].)

Moreover, "[i]t is readily apparent that the liability of the insurer [providing the uninsured motorist coverage] (1) is secondary and derivative, and (2) is contingent on the insured's right to legal recovery against the tortfeasor." (*Id.* at pp. 505-506.) In other words, uninsured motorist coverage affords reimbursement to the insured by his own carrier for the kind of loss which would have been borne by an adverse driver's own liability policy had the uninsured motorist in fact been insured. (*Farmers Ins. Exchange* v. *Hansel* (1970) 12 Cal.App.3d 570, 573 [90 Cal.Rptr. 654].) ■ More particularly, under California law, a person injured by an uninsured motorist is entitled to collect from his own uninsured motorist carrier all damages which would be recoverable in a personal injury action against the uninsured motorist, to the extent of the loss payable limit of the uninsured motorist portion of the policy. (Ins. Code, § 11580.2, subd. (a)(1).) *Such damages include general damages for pain, suffering and inconvenience. (Northwestern Mut. Ins. Co.* v. *Rhodes* (1965) 238 Cal.App.2d 64, 67 [47 Cal.Rptr. 467].)

■ We have resorted to this somewhat lengthy exposition of the nature and objectives of uninsured motorist coverage to demonstrate, by reason of such nature and objectives, that the reasons for and the occasion of such coverage do not logically bring it within the principal reason for which a collateral source determination is justified. For example, the duty to pay the uninsured motorist claim, because it depends on establishing the culpability of the uninsured driver and not some other driver, does not therefore allow those others (the defendants here) to "garner the benefits of [their] victim's providence," for as to any such

settlement the recipient has not been the "victim" of the others involved. In short, the settlement of $12,000 received by plaintiff is in no conceivable sense traceable to any act of the defendants.

The point is made more clear by a careful scrutiny of the collateral source rule language as found in *Anheuser-Busch, Inc.* v. *Starley, supra,* 28 Cal.2d 347. There, as earlier noted, it is stated that "[w]here a person suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from *a source wholly independent of the wrongdoer.* [Citations.]" (*Id.* at p. 349, italics added.) From this language it logically follows that the rule is to be applied only to the *wrongdoer* who caused the harm for which benefits are paid, not some *other* wrongdoer.[4] *In the case before us, we repeat, the uninsured motorist coverage settlement was paid to plaintiff only because of the concurrent negligence attributable to the Jaguar driver and not because of any negligence of the defendants.* This is the crux of the difference between this case and *De Cruz.* There, the benefits paid to plaintiffs by the workers' compensation carrier were on account of the death which the defendants had caused. Here, contrastingly, the conduct of defendants had no relationship whatsoever to the settlement received by plaintiff by reason of her uninsured motorist coverage.

In terms of the relationships of the parties here, including the absent Jaguar driver, we reiterate that the uninsured motorist settlement received by plaintiff represented only a payment made on the occasion of damage inflicted by another joint tortfeasor, i.e., another wrongdoer besides defendants, regardless of what carrier was the source of the payment. As such, it represents a particular occasion for application of the concept embodied in section 877 of the Code of Civil Procedure which requires a setoff for such payments to reduce the damages exposure of the other tortfeasors.

Viewed from this perspective, there is no windfall to defendants which rewards them for their own wrong, and absent such a setoff there definitely would be an excess recovery for the plaintiff, i.e., she would receive $32,000 for a $20,000 loss. Given the theory of tort damage re-

---

[4]For example, the uninsured motorist carrier, under the *Helfend* rule would not be entitled to have its liability mitigated by *medical payments* received otherwise by the plaintiff.

covery earlier noted, i.e., to make the plaintiff whole, we see none of the policy reasons advanced in *Helfend* to be logically applicable so as to justify a departure from that fundamental theory, a departure which is precisely what the collateral source rule is.

We say there should be no departure from the fundamental rule of damages here for the further reason that uninsured motorist coverage is not an item of protection in most instances which a member of the consuming public consciously seeks out and buys. Thus, the insured, in driving with such coverage, does not fall within the *Helfend* rationale, for her receipt of uninsured motorist proceeds more accurately results from the enlightenment of state policy than from the consequence of the insured's own thrift or providence.

More importantly, however, to characterize such proceeds as a collateral source and to deny defendants the setoff would be, in our view, to exclude them arbitrarily from the kind of equitable treatment flowing from the operation of section 877 of the Code of Civil Procedure. We so observe for, as already noted, we see no compelling policy reasons arising from these facts to justify departing from the fundamental theory of tort damage awards in favor of an application of the controversial collateral source rule. In other words none of the *Helfend* rationale fit the circumstance where the plaintiff's receipt of insurance proceeds is attributable solely to the fault of a joint tortfeasor.

Otherwise, there is a particular damage aspect inherent in the subject matter which weighs in our decision and is worthy of comment. Reference has already been made, by citation to page 224 of *De Cruz*, to those varying situations in which the collateral source rule has been applied. A fair analysis of the facts of these cases indicates that they all involved payments which, if recovered in a tort action, would be characterized as *special* damages. A further tabulation of cases arising in collateral source situations which bears out this observation includes, in addition to *Helfend* and *De Cruz, McQuillan* v. *Southern Pacific Co.* (1974) 40 Cal.App.3d 802 [115 Cal.Rptr. 418]; *Lewis* v. *County of Contra Costa* (1955) 130 Cal.App.2d 176 [278 P.2d 756]; *Lebet* v. *Cappobiancho* (1940) 38 Cal.App.2d Supp. 771 [102 P.2d 1109]; *Purcell* v. *Goldberg* (1939) 34 Cal.App.2d 344 [93 P.2d 578]; *Reichle* v. *Hazie* (1937) 22 Cal.App.2d 543 [71 P.2d 849]; *Inglewood Park M. Co.* v. *Ferguson* (1935) 9 Cal.App.2d 217 [49 P.2d 305]; and *Clark* v. *Burns Hammam Baths* (1925) 71 Cal.App. 571 [236 P. 152].

In this connection, we regard it as significant that we have not been able to find a single case in which the collateral source rule has been applied where the proceeds so defined had been received as compensation for pain and suffering, i.e., as and for *general* damages, damages which uninsured motorist proceeds clearly contemplate.

The only significant mention of general damages in a reported decision concerning the collateral source rule appears in *Helfend*. In the process of explaining and reaffirming the collateral source rule, the *Helfend* court recognized that "the cost of medical care often provides both attorneys and juries in tort cases with an important measure for assessing the plaintiff's general damages." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra*, 2 Cal.3d 1, 11.) That language not only points to the contrast between general and special damages, but also illustrates the nature of the windfall which would be realized by plaintiff if that element of damages which is usually the largest component of a personal injury award, i.e., general damages for pain and suffering, were to be amplified by application of the collateral source rule to uninsured motorist proceeds. In other words, while it may fit the *Helfend* rationale to allow an injured plaintiff to receive without setoff the proceeds of a no-fault medical insurance policy, it is an entirely different matter to allow what amounts to a double recovery of general damages for pain and suffering, in contravention of the rule announced in *Laurenzi* and of the proposition implicit in Code of Civil Procedure section 877.

On the facts of this case there is yet another significant reason militating in favor of allowing defendants the setoff. If it is not allowed, defendants will be subjected to the possibility of a double exposure to damages. Such possibility exists because of Insurance Code, section 11580.2, subdivision (g), which provides as follows: "(g) The insurer paying a claim under an uninsured motorist endorsement or coverage shall be entitled to be subrogated to the rights of the insured to whom such claim was paid against any person causing such injury or death to the extent that payment was made. Such action may be brought within three years from the date that payment was made hereunder."

No suggestion or contention has been made that plaintiff's uninsured motorist carrier has lost its subrogation right. Actually, the agreement entered into between plaintiff and Nationwide on September 30, 1977,

provides, "[a]s a further consideration of this payment [of $12,000], I, Martha Waite agree to hold in trust for the benefit of Nationwide Insurance Company, all rights, claims, and causes of action which I have or may have against such owner, operator, or other person or organization legally responsible for the use of the uninsured motor vehicle." In any event, under the special three-year statute of limitations granted by the above-quoted code section, plaintiff's carrier has until September 30, 1980, to file a subrogation action against defendants. This feature of the case clearly distinguishes it from *De Cruz* wherein the compensation carrier had expressly waived its subrogation right. Thus, if the judgment in the case here is affirmed, defendants will still be exposed to a possible claim for $12,000 over and above the $20,000 they would have paid to plaintiff. It is conceivable, therefore, that *defendants* could be required to pay a total of $32,000 for a claim which the jury determined to be worth $20,000. This eventually could obtain because of the subrogation rights of the uninsured motorist carrier and defendants' role as joint tortfeasors.

In other words, carrying this possibility over into an analysis made with reference to one of the rationale for the collateral source rule, namely where that source is one that is "wholly independent of the tortfeasor" (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 6), the following can be observed. Because the prospect exists, if the collateral source rule were applied here, that the plaintiff would receive $12,000 from her own carrier and $20,000 ($12,000 plus $8,000) from defendants, the further prospect exists that *both* of the $12,000 payments would be received from defendants.

We see it thusly, for one payment of $12,000 would be made directly in satisfaction of the judgment and the other, via defendants' subrogation liability, indirectly through the uninsured motorist carrier. With this a likely possibility, we see, in reality, that to allow the collateral source rule to apply here imports the likelihood of the defendants' having to pay twice for the same injury. As a consequence, it can be argued that the *source* of the uninsured motorist proceeds is *not* wholly independent of the tortfeasor.

Based upon what we have said, it is our holding that the trial court improperly reversed its ruling on the motion *in limine* and that defendants should have been accorded the setoff.

## DISPOSITION

The judgment is modified to reduce the judgment in favor of plaintiff from $20,000 to $8,000, and as so modified is affirmed. Defendants shall recover their costs on appeal.

Kaufman, Acting P. J., and Morris, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 6, 1980. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.