[Civ. No. 52303. First Dist., Div. One. July 7, 1983.]

GEORGE S. KRUSI, Plaintiff and Appellant, v.
BEAR, STEARNS & CO., Defendant and Appellant.

COUNSEL

Robert S. Rutledge and Richard G. Logan for Plaintiff and Appellant.

Robert H. Logan, Robert D. Feighner and Keesal, Young & Logan for Defendant and Appellant.

Murphy, Weir & Butler, Michael Kip Maly, Theodore H. Focht, Michael E. Don and Stephen P. Harbeck as Amici Curiae.

OPINION

**BREINER, J.*—**Plaintiff brought suit against Bear, Stearns & Co., a national stock brokerage firm, for conversion of 883 shares of General Motors stock. Plaintiff had been a customer of another brokerage firm, now defunct, the San Francisco Investment Corporation (hereafter SFIC), a small firm that was not a member of a stock exchange. In order to execute stock purchases or sales for its customers, SFIC entered into "clearing" relationships with Bear, Stearns and other large brokerage houses. In return for services rendered, SFIC paid a portion of its commissions to the transacting brokerage firm.

In the course of its dealings with Bear, Stearns, SFIC maintained an "omnibus" account for transactions on behalf of SFIC's customers in which the identity of SFIC's customers was not disclosed to Bear, Stearns. SFIC also had an investment account for whatever trading it did for its own investment and not as an agent.

In June 1976, Bear, Stearns agreed to loan SFIC $20,000 as an advance on anticipated commissions. In connection with the loan, SFIC deposited

*Assigned by the Chairperson of the Judicial Council.

with Bear, Stearns 500 shares of Utah International stock. The stock was deposited merely as a gesture of good faith and not as security for the loan.

On its records, Bear, Stearns opened a "commissions payable" account for SFIC showing the $20,000 advance and an investment account No. 46-10238 for SFIC into which the 500 shares of Utah International were deposited.[1]

The Utah International stock actually belonged to one of SFIC's customers, but Bear, Stearns was unaware that this stock was not owned by SFIC.

In April 1977, SFIC expanded its clearing arrangement with Bear, Stearns and began to convert its own customers' cash accounts to what is called "a fully disclosed basis." That is, SFIC arranged to have Bear, Stearns handle all of the transaction statements, monthly statements and other paperwork, thereby disclosing to its own customers that Bear, Stearns was executing the stock transactions.

In December 1976, plaintiff, as a customer of SFIC, deposited 883 shares of General Motors stock with SFIC for safe-keeping.[2] From December 1976 to April 1977, plaintiff received statements from SFIC showing his General Motors stock in his account. In June 1977, plaintiff for the first time received such a statement from Bear, Stearns. The yearend statement issued in December 1977 by Bear, Stearns again showed that SFIC was holding the General Motors stock for plaintiff's account.

Meanwhile, SFIC was in financial difficulty.[3] This difficulty continued into 1977 and by April, SFIC had defaulted on its loan from Bear, Stearns, having repaid only about $3,000 of the $20,000 due. Accordingly, in April 1977, David Mulgrum of Bear, Stearns demanded of James Curtis, the president and major stockholder of SFIC, that the advance to SFIC be paid by the end of Bear, Stearns' fiscal year, April 30. Curtis responded that he would deliver 883 shares of General Motors stock to be "margined" and the cash proceeds used to pay off the balance due. Mulgrum accepted this proposal.

Thus, on April 20, 1977, SFIC transferred plaintiff's General Motors stock to Bear, Stearns. The stock certificates were in plaintiff's name but

---

[1] In February 1977, the Utah International stock was exchanged for 650 shares of General Electric based on the merger of the two companies.

[2] In line with a customary practice, plaintiff had signed a number of blank stock power forms to facilitate any future sale of the shares.

[3] In negotiating for the $20,000 loan advance, SFIC did not disclose to Bear, Stearns that it was in violation of the net capital requirements.

were accompanied by an executed stock power with plaintiff's signature guaranteed. SFIC did not inform Bear, Stearns that the stock was actually owned by plaintiff. Nor did SFIC inform plaintiff of this transaction; it was conducted entirely without his knowledge or consent.[4]

Upon receipt by Bear, Stearns of the General Motors stock, SFIC's commissions payable account was credited with $16,857, leaving a balance due of zero. In turn, the stock was deposited into SFIC's investment account No. 46-10238, and the account debited the same amount ($16,857).[5] This transaction had the effect of converting the investment account from a cash account to a margin account—i.e., a balance owing against the stock deposited therein.

On the date of receipt, plaintiff's stock was worth $66¾ per share, or $58,940.

In September 1977, one of SFIC's customers obtained a judgment against the firm. In February 1978, the judgment creditor seized the assets of SFIC and on March 6, 1978, the firm was closed.

On March 10, 1978, Bear, Stearns sold 517 shares of plaintiff's stock and applied the proceeds to SFIC's outstanding balance.

A few days earlier, on March 6, 1978, Curtis told a representative of Bear, Stearns that the General Motors stock belonged to plaintiff. Marshall Geller, manager of Bear, Stearns' San Francisco office, testified he was advised of plaintiff's claim to the stock before it was sold. He also recalled being asked by representatives of the SEC and NASD not to sell the stock.

David Hyman, legal officer of Bear, Stearns, recalled that in March 1978, he learned from the SEC and NASD of a claim against the General Motors stock but was *not* instructed that Bear, Stearns could not sell the stock. He discussed with David Mulgrum the firm's ability to liquidate the stock and conducted an investigation. He concluded that because Bear, Stearns had acquired the stock in good faith without reason to believe it to be stolen, the company had the right to sell the stock and apply the proceeds to the SFIC debt.

---

[4] James Curtis drafted a letter on SFIC stationery which purported to confirm plaintiff's oral agreement to lend his General Motors stock to SFIC. The letter was fictitious; plaintiff had never made such an agreement. The letter was kept in the SFIC files to justify SFIC's transfer of the stock to Bear, Stearns.

[5] Upon the receipt of the General Motors stock from SFIC, Bear, Stearns returned the General Electric stock which had been held on deposit.

Meanwhile, in January 1978, Curtis told plaintiff that SFIC had transferred plaintiff's stock for SFIC's purposes, but that Curtis would endeavor to get the General Motors stock back for plaintiff. Curtis signed a promissory note acknowledging he owed plaintiff the missing shares. On March 9, 1978, Curtis signed a promissory note in favor of plaintiff for $106,254 to cover the $60,000 worth of General Motors stock and three other conversions (apparently of cash). The note was secured by a deed of trust on Curtis' home. In fact, however, legal title had been transferred to Curtis' wife.[6]

Curtis was eventually convicted of misappropriation of funds and sent to prison. We note that in this lawsuit plaintiff does not seek recovery from Curtis for his misdeeds but seeks damages from Bear, Stearns for conversion of his General Motors stock.

An expert witness testified for plaintiff that the rules of the New York Stock Exchange require a stockbroker to investigate the ownership of stock deposited in an account of a customer and that stock in the name of another party should be verified as belonging to the account-holder. Defendant's expert rendered a contrary opinion.

Out of the presence of the jury evidence was presented to the court that under the Securities Investor Protection Act (hereafter SIPA) a trustee was appointed to handle the liquidation of SFIC. In collecting the assets of SFIC, the trustee obtained the 366 unsold shares of General Motors stock held by Bear, Stearns. At the time of trial, the trustee still had possession of those shares. On July 28, 1978, plaintiff received $50,000 from the trustee-in-liquidation of SFIC. Of that $50,000, $20,000 represented payment for cash taken out of plaintiff's account by Curtis and $30,000 was for the conversion of the General Motors stock.[7] In exchange for that payment, plaintiff assigned his rights against SFIC to the Securities Investor Protection Corporation (hereafter SIPC). The trustee anticipated at trial that another payment of $6,000 would be made to plaintiff upon final disposition of SFIC assets. In fact, plaintiff thereafter received another payment of $9,416.74 from the trustee.[8]

---

[6]Curtis' wife later paid plaintiff $24,000 in exchange for a release of the deed of trust. This evidence was not presented to the jury.

[7]SIPA provides for a maximum payment to an investor of $50,000, including a maximum of $20,000 for cash conversions. (15 U.S.C. § 78fff(f).) Accordingly, the balance of $30,000 represented compensation for plaintiff's converted stock.

[8]This court has heretofore taken judicial notice of the final report and accounting of the trustee and of the United States District Court order approving it. (Evid. Code, § 452, subd. (d).) That report evidences the $9,416.74 payment.

Evidence was also presented that plaintiff had filed a claim with SFIC's bonding company, and the trustee expected plaintiff would receive $3,000 from that source.

The jury found that Bear, Stearns was guilty of conversion and awarded plaintiff $58,940 in compensatory plus $50,000 in punitive damages. The trial court reduced the compensatory award by $30,000 to take into account the payment received by plaintiff from the trustee in liquidation. Both parties appeal.[9]

I

## COMPENSATORY DAMAGE OFFSETS

At the outset, it should be noted that Bear, Stearns does not seriously challenge its liability for conversion. ■ Indeed, an action for conversion rests simply upon the interference with the plaintiff's dominion over his property. The action is a species of strict liability in which the defendant's good faith, due care, ignorance or mistake are irrelevant and may not be set up as a defense. (*Edwards* v. *Jenkins* (1932) 214 Cal. 713, 721 [7 P.2d 702]; *City of Los Angeles* v. *Superior Court* (1978) 85 Cal.App.3d 143, 149 [149 Cal.Rptr. 320]; *Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 770-771 [140 Cal.Rptr. 388].) The focus of this appeal is on the amount of damages.

At the beginning of trial, Bear, Stearns argued that evidence of various compensatory payments received by plaintiff should be taken into account in determining the amount of compensatory damages. Plaintiff argued, on the other hand, that such payments were irrelevant under the "collateral source rule." The trial court took the matter under submission and permitted evidence of the payments to be introduced outside the presence of the jury with the understanding that if the court eventually agreed with Bear, Stearns, it would subtract the payments from the award.

At the conclusion of trial, Bear, Stearns renewed its assertion that these various payments should be deducted from the jury's award. The trial court entered a conditional order granting the motion for new trial unless plaintiff accepted a reduction of $30,000. Plaintiff accepted the remittitur. On appeal, Bear, Stearns contends that the other payments received by plaintiff should have been deducted from the award as well. Plaintiff has cross-appealed and contends the court should not have offset the award by the amount received from the Securities Investor Protection Fund.

---

[9]The Securities Investor Protection Corporation (SIPC) appears as amicus curiae.

The general rule of compensatory damages bars double recovery for the same wrong. This basic principle underlies two other rules applicable in the present case. ■ First, although good faith and mistake are not defenses to an action for conversion, the plaintiff's damages will be reduced if the defendant returns the property or the plaintiff otherwise recovers the property. (*Blewett* v. *Miller* (1900) 131 Cal. 149 [63 P. 157]; *George* v. *Pierce* (1898) 123 Cal. 172, 176 [55 P. 775, 56 P. 53]; *Ross* v. *Sweeters* (1932) 119 Cal.App.3d 716, 721 [7 P.2d 334]; see generally, 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 875, p. 3162.)

■ Second, it has long been recognized that if one tortfeasor pays partial compensation to the plaintiff, the liability of other tortfeasors will be correspondingly reduced: ". . . payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover." (*Laurenzi* v. *Vranizan* (1945) 25 Cal.2d 806, 813 [155 P.2d 633]; see also *De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 225-226 [70 Cal.Rptr. 550, 444 P.2d 342].) Section 877 of the Code of Civil Procedure embodies that rule where a formal release, dismissal or covenant not to sue is given.[10] (*McGee* v. *Cessna Aircraft Co.* (1978) 82 Cal.App.3d 1005, 1021-1022 [147 Cal.Rptr. 694] [reduction by amount of settlement, not by amount of proportionate responsibility]; see generally 4 Witkin, Summary of Cal. Law, *op. cit. supra,* Torts, §§ 38-39, pp. 2336-2339.)

It makes no difference whether the payment comes directly from the tortfeasor or from the tortfeasor's insurance carrier; in either circumstance, a credit must be given. (*Dodds* v. *Bucknum* (1963) 214 Cal.App.2d 206, 213-214 [29 Cal.Rptr. 393] [defendant's insurance carrier paid plaintiff's medical expenses]; *Turner* v. *Mannon* (1965) 236 Cal.App.2d 134, 139-140 [45 Cal.Rptr. 831] [same]; see *Kirtland & Packard* v. *Superior Court* (1976) 59 Cal.App.3d 140, 145 [131 Cal.Rptr. 418]; see also *Waite* v. *Godfrey* (1980) 106 Cal.App.3d 760 [163 Cal.Rptr. 881] [uninsured motorists proceeds].)

---

[10]Although the statute mentions only a settlement reached *before judgment,* the statute has been construed to include a settlement reached before the judgment became final—i.e, while an appeal was pending. (*Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81, 86-87 [91 Cal.Rptr. 301].)

The statutory rule eliminates the common law distinction between joint tortfeasors and concurrent or successive tortfeasors (see *Ash* v. *Mortensen* (1944) 24 Cal.2d 654 [150 P.2d 876]); the rule of *pro tanto* reduction applies to all "tortfeasors claimed to be liable for the same tort . . . ." (Code Civ. Proc., § 877.)

■ The long established "collateral source rule," however, operates as an exception to the mitigation of damages principle. It provides that where the plaintiff obtains compensation from his *own* insurer or a source independent of ("collateral" to) the tortfeasor, plaintiff's tort recovery is *not* reduced. (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 Cal.Rptr. 448, 166 A.L.R. 198].) The purpose of the rule was explained by the Supreme Court: "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 10 [84 Cal.Rptr. 173, 465 P.2d 61].)[11]

In affirming this controversial rule, the Supreme Court distinguished payments from cotortfeasors: "In *Laurenzi* v. *Vranzian* [*sic*] (1945) 25 Cal.2d 806, 813 [155 P.2d 633], this court held that 'payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover.' Hence, the [collateral source] rule applies only to payments that come from a source entirely independent of the tortfeasor and does not apply to payments by joint tortfeasors or to benefits the plaintiff receives from a tortfeasor's insurance coverage. (See *De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 225-226; *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 71-72 [17 Cal.Rptr. 369, 366 P.2d 641]; *Turner* v. *Mannon* (1965) 236 Cal.App.2d 134, 138-139 [45 Cal.Rptr. 831]; *Dodds* v. *Bucknum* (1963) 214 Cal.App.2d 206, 212-213 [29 Cal.Rptr. 393]; see 2 Harper & James, The Law of Torts (1968 Supp.) § 25.22, fns. 5-6, at pp. 153-154.)" (2 Cal.3d at p. 8, fn. 7.)

The question this court must decide is whether various payments which plaintiff received came from a cotortfeasor so as to entitle defendant Bear,

---

[11]The court reasoned that the danger of double recovery under the collateral source rule is obviated where provisions are made for subrogation or refund of the tort recovery by the insured. (*Id.,* at p. 11.)

Stearns to a *pro tanto* reduction; or whether such payments emanated from a source wholly independent of the tortfeasor so as to fall within the collateral source rule.

### 1. *The Curtis Settlement*

The $24,000 payment from Mrs. Curtis was made to release the deed of trust encumbering *her* property. Although James Curtis testified he had the "understanding" that the payment also cancelled the $106,254 note he had given plaintiff, no credible evidence supports this conclusion. Nevertheless, the payment was not from a source "entirely independent" of the tortfeasor and therefore does not fall within the collateral source rule. *Helfend* does not require that payment be made by a joint tortfeasor or his insurer in order to be offset against a plaintiff's claim. The general rule barring double recovery would be unreasonably violated if an offset were not given. However, in view of the fact that some, or all, of the $24,000 may have been paid as reimbursement for the cash conversions, rather than for the General Motors stock, the case will be remanded to the trial court for evidence on that issue and to determine what portion, if any, of the $24,000 should be offset against the stock loss. (*Knox* v. *County of Los Angeles* (1980) 109 Cal.App.3d 825 [167 Cal.Rptr. 463].)[12]

### 2. *The Broker's Bond*

The broker's bond had been purchased by SFIC, a cotortfeasor in the conversion of plaintiff's stock. Any payment to plaintiff on the bond was obviously made on behalf of SFIC, the cotortfeasor. Although the payment came from the insurer-bond holder rather than directly from SFIC, we conclude that a credit must be given. (*Dodds* v. *Bucknum, supra,* 214 Cal.App.2d at pp. 213-214.)

The trial court properly declined to offset any payment made to plaintiff by the bonding company, since none had been made as of the time of trial. For the same reasons discussed above concerning the Curtis settlement, the trial court will be ordered, on remand, to take evidence as to the amount of such payments and to determine what portion thereof, if any, should be offset against the compensatory damage award. We note that some, if not all, of such payments as may have been received may represent compensation for the cash conversion and not for the stock loss. The trial court will receive evidence on that issue as well.

---

[12]Plaintiff argues that Bear, Stearns is entitled to no credit for this payment because (1) Bear, Stearns and Curtis were not joint tortfeasors, (2) the money was not paid to release Curtis from liability, but for some other reason. The trial court made no findings to support its denial of this credit.

### 3. *Distribution From SIPC*

■ The $50,000 payment received by plaintiff from SIPC was made pursuant to the Securities Investor Protection Act (15 U.S.C. § 78aaa et seq.). Pursuant to the act, SIPC has created a fund by way of assessments from member-brokers (15 U.S.C. § 78ddd) which is used to satisfy claims of customers of a bankrupt broker. (15 U.S.C. § 78fff(f).)

The parties have divergent views of the significance of this statutory scheme.

Bear, Stearns argues that the payment from SIPC was not from a source independent of the tortfeasor but rather from one directly related to SFIC. This argument is based on the hypothesis that the payment was made on behalf of SFIC from a fund to which SFIC contributed to provide protection in just this sort of case, and that the payment was thus analogous to an insurance payment from an insurer of SFIC and should be treated as a payment from the cotortfeasor, SFIC.

Plaintiff, on the other hand, contends that since the SIPC payment falls within the collateral source rule, no credit should be given.

A case which provides some support for plaintiff's position is *Anheuser-Busch, Inc.* v. *Starley, supra,* 28 Cal.2d 347. There, defendant's car collided with a truck containing the plaintiff's goods; the plaintiff sued for negligence. Defendant asserted that her liability should be reduced because the plaintiff had been fully compensated for its loss by the carrier for the trucking company. The Supreme Court disagreed and concluded that the plaintiff's recovery from the carrier was from a source wholly independent of the tortfeasor. Rejecting the argument that the payment was a discharge by one tortfeasor, the court explained: "[T]he payment was not based on any tortious liability. The carrier's liability [to compensate for damage to property in transit] was absolute and not dependent upon any fault on its part. It was a discharge of a liability independent of any tort liability and not arising from the same basis as the liability of defendant which is based on her tortious conduct, negligence." (28 Cal.2d at p. 351.)

The case at bench seems analogous. The obligation of SIPC to pay the claims of customers of the bankrupt SFIC was virtually absolute. The payment to plaintiff depended only upon the bankruptcy of SFIC, not upon any tortious conduct on the part of SFIC. Plaintiff would have had a claim even if his stock had not been converted but had been properly kept on deposit. The payment discharged SIPC's statutory obligation to satisfy the claims of

bankrupt brokers; it did not arise on account of SFIC's liability in tort.[13] (Cf. *Waite* v. *Godfrey, supra,* 106 Cal.App.3d 760, 772 [uninsured motorist proceeds from plaintiff's insurer did not fall within collateral source rule since payment made on occasion of damage by *another* tortfeasor].)

Of course, the problem is that if no offset is made for the $30,000 payment, plaintiff will receive recovery—once from SIPC and a second time from defendant Bear, Stearns. The trial court reduced the damage award by $30,000 because it found no evidence that plaintiff was obligated to refund the $30,000 to SIPC. Plaintiff argues, however, that the danger of double recovery is obviated by provisions in SIPA for subrogation.

SIPA provides that upon payment by the trustee of benefits from the fund, "SIPC shall be subrogated to the claims of such customers." (15 U.S.C. § 78fff(f).) The courts have construed this statutory rule in light of common law principles of equitable subrogation and have held that SIPC stands in the shoes of the customer and becomes subrogated to the customer's rights against not just the bankrupt broker, *but against third parties.* (*Redington* v. *Touche Ross & Co.* (2d Cir. 1978) 592 F.2d 617, 624, revd. on other grounds, 442 U.S. 560 [61 L.Ed.2d 82, 99 S.Ct. 2479] [SIPC subrogated to customer's claim against accountant who prepared misleading statements of broker's financial affairs]; see *S. E. C.* v. *Albert & Maguire Securities Co.* (3d Cir. 1977) 560 F.2d 569, 574.)

Under this theory, then, upon payment to plaintiff, SIPC became subrogated to plaintiff's claim against Bear, Stearns for the conversion of plaintiff's stock. But SIPC's right of subrogation means only that it may bring a cause of action against *Bear, Stearns* as an assignee of plaintiff's claim. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 124, p. 5342.) We discern no theory upon which SIPC may demand a refund from *plaintiff* for the amount paid to him.

Moreover, if SIPC stands in the shoes of plaintiff and is subrogated to his rights, it would seem that SIPC is an indispensable party to the conversion action. (*Bank of Orient* v. *Superior Court* (1977) 67 Cal.App.3d 588, 594-596 [136 Cal.Rptr. 741].) At least as to the $30,000 which plaintiff has received, plaintiff is not the real party in interest. He has no standing to recover, since his rights have been assigned to SIPC.

---

[13]Plaintiff raises a number of other arguments which have no merit. (1) Bear, Stearns and SFIC were not joint tortfeasors since SFIC converted cash and stock while Bear, Stearns converted only stock. (2) Because SFIC's contributions to the SIPC fund were undoubtedly passed on to its customers, plaintiff must be viewed as the source of the SIPC payment. (3) The only purpose of the SIPC is to protect customers; thus, Bear, Stearns, a third party, should get no benefit from the payment to plaintiff. (4) Until plaintiff is fully compensated for his losses, Bear, Stearns should get no credit.

Since SIPC is subrogated to the rights of plaintiff, the reduction of the award by $30,000 was nevertheless proper, not because it falls outside the collateral source rule, but because plaintiff was not the proper party to recover those funds.

### 4. *Subsequent Distributions*

■ The subsequent distribution of $9,416.74 by the trustee must be offset. Such funds apparently came from the liquidation of the assets of SFIC, as we infer from the report and recommendation approved by the United States District Court; they are consequently deemed to have been paid by a joint tortfeasor. The payment cannot have come from the SIPC fund, for, as noted above, the statutory maximum of $50,000 had already been paid. On remand, the trial court will modify the judgment and, as with the Curtis settlement and the broker's bond, determine how much of this payment should be allocated to plaintiff's claim for his lost stock.

## II

### PUNITIVE DAMAGES

In addition to the award of compensatory damages, the jury awarded plaintiff $50,000 in punitive damages. Bear, Stearns contends this award is unfounded and excessive.

■ There is no question that punitive damages may be recovered in an action for conversion. (E.g., *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339 [87 Cal.Rptr. 226] [seizure of plaintiff's car by company claiming security interest].) Punitive damages are recoverable, however, only upon a showing of malice, fraud or oppression. (Civ. Code, § 3294.) Since there was no evidence of fraud or oppression, the jury was instructed only on malice as a basis for punitive damages.[14] That instruction generally comports with the judicial definitions (e.g., *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 906-907 [157 Cal.Rptr. 693, 598 P.2d 854]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rpr. 711, 521

---

[14] "If you find that plaintiff sustained actual damages in accordance with these instructions, the result of the conduct of the defendant, you may then consider whether you should award additional damages against defendant for the sake of example and by way of punishment. But a mere finding that plaintiff's stock was converted by defendant, if you so find, will not support an award of such damages known as punitive and exemplary damages. Before such additional damages may be awarded, you must also find by a preponderance of the evidence that defendant was guilty of malice, expressed or implied, in connection with the conduct in question.

"Malice means a motive or willingness to vex, annoy or injure another person. Hence, punitive or exemplary damages can only be awarded if you also find that there was such a conscious and deliberate disregard of the interest of others that defendant's conduct may be called willful or wanton."

P.2d 1103]) and with the new statutory definition now incorporated into section 3294: "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1), as amended 1980.)

Plaintiff's position in the trial court was that Bear, Stearns committed *two* conversions—one when it accepted the stock in April 1977, and once again when it sold the stock on March 10, 1978. The evidence relied upon by plaintiff to justify an award of punitive damages was as follows: In April 1977, Bear, Stearns violated rule 405 of the New York Stock Exchange in failing to inquire about the true ownership of the General Motors stock before accepting it as security.[15] And again in March 1978, Bear, Stearns should have checked the ownership of the stock before selling the shares.[16]

■ In support of the punitive damage award, plaintiff argues that the jury could find from the totality of the evidence that Bear, Stearns knew or had grounds for suspicion that plaintiff owned the stock, but failed to make any investigation to determine the true ownership. Plaintiff contends that the jury could draw the inference that the decisions of Bear, Steans to accept the stock as security and then to sell the stock and apply the proceeds to the debt owed by SFIC without further investigation were decisions made in callous disregard of plaintiff's rights and solely to protect Bear, Stearns' own economic interests.

Such evidence is, we grant, susceptible to the less invidious interpretation that it was mere negligence, which—even if gross, or reckless—cannot justify punitive damages. (*Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706] [physician operated on wrong patient].) " '[A] tort committed by mistake, in the assertion of a supposed right, or without any wrong intention, and without such recklessness as evinces malice or a conscious disregard of the rights of others, does not warrant punitive damages.' " (*Kendall Yacht Corp.* v. *United California Bank* (1975) 50

---

[15]That rule requires brokers to use "due diligence" to learn the essential facts relating to each customer and account.

[16]The Restatement of Torts recognizes that there may be successive acts by the same person, each of which is a conversion. (Rest.2d Torts, § 927, com. d, p. 536.) Plaintiff, then, may elect to recover the value of the property at the time of *either* conversion. (*Ibid.*) Here, plaintiff elected the April 1977 conversion; the only evidence of value of the stock pertained to that time.

Cal.App.3d 949, 959 [123 Cal.Rptr. 848] [bank refused to honor checks].)[17]

■ But it is not our function to characterize Bear, Stearns' conduct as either negligent or intentional and malicious; where, as here, the evidence will support either conclusion, the issue is a fact-question for the jury, as the trial court determined. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 [169 Cal.Rptr. 691, 620 P.2d 141]; *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d 339, 351.) ■ ■ The appellate court will not overturn an award of punitive damages if there is any substantial evidence to support the award (*Weisenburg* v. *Molina* (1976) 58 Cal.App.3d 478, 490 [129 Cal.Rptr. 813]) and on the record before us we find substantial, if conflicting, evidence of malice. As noted above, defendant's officers were told by Curtis prior to their having sold plaintiff's stock that the shares were owned by Krusi; representatives of the SEC and NASD asked defendants not to sell the stock; and defendant's in-house legal representative, after being advised that the stock was stolen, nevertheless directed that it be sold, rationalizing that defendant did not know it to be stolen when it first acquired the stock. Certainly, that evidence can be interpreted as a "conscious and deliberate disregard" of plaintiff's rights.

Nevertheless, we are persuaded that consideration should be given to a reduction of the amount of punitive damages, for the following reasons: 1) the compensatory damages will be reduced on remand; 2) certain evidence of defendant's good faith reliance on advice of counsel was not heard by the jury; and 3) the jury erroneously believed that its award of $58,940 compensatory damages was final, being oblivious of any offsets.

Defendant reasons that the jury's award of $50,000 in punitive damages reflects the jury's intent to award approximately the same amount in punitive as in compensatory damages. Thus, Bear, Stearns argues that when the trial court reduced the compensatory damage award, the court should also have reduced the punitive damage award. We agree in part: the trial court should have at least considered reducing that award.

In the alternative, defendant contends that the jury should have been informed of the offsetting credits. ■ However, courts have generally

---

[17]Bear, Stearns also argues that evidence negating any malice on its part was improperly excluded. Specifically, it contends it should have been permitted to show that it turned over the unsold 366 shares of General Motors stock to the trustee immediately upon demand. Secondly, Bear, Stearns contends it should have been allowed to present testimony of its legal counsel concerning conversations with David Mulgrum on the sale of the stock. Such testimony, defendant reasons, would have shown good faith reliance on the advice of counsel.

held that evidence of a settlement by a cotortfeasor is confusing and potentially prejudicial; it is not admissible on the issue of liability. The proper procedure is for the court to make the arithmetical calculations, reducing the recovery *pro tanto,* after the verdict has been rendered. (*Shepherd* v. *Walley* (1972) 28 Cal.App.3d 1079, 1082-1084 [105 Cal.Rptr. 387]; see also *Knox* v. *County of Los Angeles, supra,* 109 Cal.App.3d at pp. 834-835 and cases cited.) The trial court properly followed that procedure. But it has also been held that an award of punitive damages must bear some relation to the actual damages sustained. (*Rosener* v. *Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 751-753 [168 Cal.Rptr. 237]; *Wetherbee* v. *United Insurance Co.* (1968) 265 Cal.App.2d 921, 934 [71 Cal.Rptr. 764] [error to refuse instruction on reasonable relationship requirement].) Thus, if the jury is not informed about the mitigation of plaintiff's *actual* losses, there is a strong likelihood that the jury will return an inflated award of punitive damages.

On remand, the trial court will reconsider its ruling on the new trial motion (see *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 82 [137 Cal.Rptr. 863, 562 P.2d 1022]) and after it has determined the proper amount to offsets to the compensatory damage award, will consider whether there should be a reduction in the amount of punitive damages. If a reduction is determined to be appropriate, the trial court may wish to order a remission of a portion of the punitive damages as a condition to an order granting a new trial.

The judgment is reversed and the case remanded for further proceedings on the offset and punitive damages issues discussed above.

Newsom, J., concurred.

**ELKINGTON, Acting P. J.,** Concurring and Dissenting.—I concur generally with my respected colleagues' opinion, except that I would not remand to the trial court for the suggested reduction of punitive damages because "the evidence was weak in establishing malice."

I would reverse the punitive damage award *for lack of substantial evidence of malice.* Although, as the court's opinion says, "malice is ordinarily a question of fact for the jury," it is not such a question of fact where there is no substantial evidence to support it.

Here plaintiff Krusi negligently entrusted SFIC with endorsed, and therefore negotiable, stock certificates (street shares) for "safekeeping." SFIC became indebted to defendant broker, Bear, Stearns & Co., represented the shares to be owned by itself, and delivered them to the broker as security for its debt, collection of which would otherwise be enforced. SFIC there-

after failed financially and the broker heard rumors, or was advised, that the supposedly hypothecated shares were not owned by SFIC. Going to its attorney for advice the broker was told that the stock certificates, having been acquired in good faith and for a consideration, with reason to believe that they were street shares owned by SFIC, it had a right to sell them and apply the proceeds toward SFIC's debt. (Many would believe the advice sound, and that plaintiff Krusi was estopped to claim otherwise.) The broker, Bear, Stearns & Co., followed the advice.

My colleagues find substantial evidence of malice. I do not.

I believe I have adequately expressed my views on the subject of punitive damages by the concurring opinion in *Rosener* v. *Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 758 [168 Cal.Rptr. 237]. I shall not here repeat them, except to say that malice is patently not shown where one acting on the advice of counsel believes himself to be entitled to security, the true owner of which had negligently clothed a later convicted thief with the indicia of ownership.

I commend to higher authority, a curb on today's rampant punitive damage awards, to which concededly no plaintiff is entitled, against which one may not obtain insurance, and as to which one may now be mulcted, without fraud, oppression, or malice on his part, but instead for negligence or advice of counsel found by a trier of fact to be erroneous.

A petition for a rehearing was denied August 1, 1983, and the opinion was modified to read as printed above. The petition of plaintiff and appellant for a hearing by the Supreme Court was denied September 7, 1983.