[No. F004119. Fifth Dist. Feb. 4, 1986.]

PHILIP CHANG & SONS ASSOCIATES, Plaintiff and Respondent, v.
LA CASA NOVATO, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part II.

160

## COUNSEL

Samuel C. Palmer III, Trevor C. Clegg and Wild, Carter, Tipton & Oliver for Defendant and Appellant.

Donald C. Thuesen for Plaintiff and Respondent.

## OPINION

**CASTELLUCCI, J.**\*—Plaintiff and respondent, Philip Chang & Sons Associates, a limited partnership, (Chang), brought suit for damages for intentional and negligent misrepresentation against defendant and appellant, La Casa Novato, a limited partnership, (Novato), and defendant, Sue Ann Burge, both individually and in her capacity as general partner of Novato.

A jury rendered a verdict in favor of Chang in the amount of $168,200 compensatory damages and $1,682 punitive damages. The jury found against Novato but found in favor of defendant Sue Ann Burge against Chang.

### THE FACTS

In 1978, respondent entered into negotiations with appellant La Casa Novato, a limited partnership, of which Edward Burge was the general partner and his wife, Sue Ann Burge, a limited partner. The principal asset of appellant was an apartment complex (Novato complex) located in the City of Novato, California, which was built with Federal Housing Administration (FHA) financing and subject to an FHA mortgage.

Respondent and appellant engaged in negotiations for the purchase and sale of the Novato complex under the direction of Richard Paolini (Paolini), a real estate broker who acted as agent for both parties, and executed a final purchase agreement on April 28, 1978.

---

\*Assigned by the Chairperson of the Judicial Council.

During the course of negotiations, appellant's principal assured respondent that the roofs on the buildings of the Novato complex were sound and subject to warranty for an additional six years. Relying on these representations, respondent instructed an engineer hired by Paolini not to examine or inspect the roofs. Other inspections by Philip Chang, the engineer, a pest control inspector, and Paolini did not reveal any indication of leaking in the apartments nor any other evidence which would have alerted them to the existence of any defects in the roof.

Following respondent's purchase of the apartment complex, the onset of rainy weather revealed considerable leakage and ponding of rain water occurred on the roofs.

Respondent subsequently learned there was no warranty on the apartment roofs and that appellant's principals had apparently been aware of a problem with roof leakage prior to their representations to respondent.

Philip Chang testified he incurred significant repair bills due to the leakage and was forced to credit tenants' rentals due to the damage caused by the leakage. He further testified he would not have bought the Novato complex at the price he paid had he been aware of the defective and leaky condition of the roofs, and stated that in his opinion the value of the apartment complex was much less than the purchase price actually paid. Max Harrington, a roofing expert, testified that his estimate of the cost of replacing the defective roofs and restoring them to a waterproof condition, as of June 1978, was $154,000.

John Hamilton, an expert appraiser called by appellant, testified the fair market value of the Novato complex as of June 28, 1978, was $3.5 million, and that if a buyer was forced to reroof within three years, the fair market value would be between $3.46 million and $3.47 million.

DISCUSSION

I.

THE EXCLUSION OF APPELLANT'S PROFFERED EVIDENCE OF FHA-AUTHORIZED RENTAL INCREASES.

■ Appellant contends, and respondent correctly concedes, that an essential element of a cause of action for fraud is actual damages sustained by the plaintiff in reliance on the misrepresentations. (See 4 Witkin, Sum-

mary of Cal. Law (8th ed. 1974) Torts, § 479, p. 2738.) ■ Both parties agree the applicable measure of damages is set forth in Civil Code section 3343, which codifies the "out-of-pocket loss rule" as the exclusive remedy for a defrauded purchaser of realty or other property. (*Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 24-25 [147 Cal.Rptr. 655]; *Garrett* v. *Perry* (1959) 53 Cal.2d 178, 183 [346 P.2d 758].)

At trial, appellant attempted to introduce evidence that the FHA regulations authorized, upon approval of application therefor, an increase in rentals to recoup expenses incurred by respondent in repairing the roofs and that respondent made such an application which had been approved by FHA.[1] The purpose of the proffered evidence was to show that respondent's actual damages would be reduced by the extent of such increase. The trial court excluded the evidence. It is unclear from the record before us as to the ground relied upon by the trial court in making its exclusion ruling. Three theories of exclusion were advanced and discussed at trial, namely, (1) the collateral source rule, (2) the rule that benefits obtained by a contracting party subsequent to his defraudation are not admissible on the issue of damages (see *Hancock* v. *Williams* (1950) 99 Cal.App.2d 80 [221 P.2d 129]), and (3) exclusion pursuant to Evidence Code section 352.

■ Appellant, citing the definition of "relevant evidence" set forth in Evidence Code section 210,[2] offers the following hypothetical in support of its contention the evidence of the FHA-authorized rental increase is relevant to the issue of damages: "*A* purchases the Blackacre Apartments from *B*. The loan agreement for the Blackacre Apartments provides that if maintenance and repair expenses increase, the owner may obtain compensation for those expenses by means of a rent increase. After *A* buys the complex, the roofs leak and cause substantial repair and maintenance costs. *A* applies for and receives a rental increase, which compensates *A* for increased costs of repairs and maintenance. Can *A* sue *B* for misrepresentation? [Appellant] submits that the answer must . . . be negative. *A* has, in effect, received precisely what he bargained for. He (presumably) bargained for an apartment complex worth X dollars. The complex with leaky roofs may be worth only—say—¾ X dollars. But if *A* receives compensation for whatever sums he must expend to make the roofs sound, he has property worth X dollars *for which he ultimately paid no more than X dollars*. He has suffered no damage and therefore lacks any basis for seeking relief from the courts."

---

[1]Appellant's offer of proof at trial was unclear as to the extent of the intended evidence beyond the fact of the existence of the FHA regulations.

[2]Evidence Code section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

Appellant therefore contends the evidence of respondent's right to compensation, through FHA-authorized rental increases, is prima facie relevant and admissible unless excluded by some extrinsic policy of the law. Respondent's response to the question of relevance appears to confuse the principles of relevance and admissibility. Respondent contends the collateral source rule prohibits the introduction of FHA-authorized rental increases received by respondent. Respondent does not directly address the question of whether the proposed evidence is relevant in the first place.

No case has previously dealt with the factual situation presently before the court. Logically, however, it seems self-evident that evidence of a defrauded purchaser's receipt of increased revenues (or reimbursement) through a regulatory agency's authorization to increase rentals is reasonably probative of whether the defrauded purchaser actually sustained any damages—an issue clearly of consequence to the determination of the dispute. (See Evid. Code, § 210.) Such evidence was therefore relevant. Having determined that the proffered evidence was relevant, the question then becomes whether some constitutional or statutory provision or judicial rule of exclusion established in the interests of justice by the California Supreme Court makes the proffered evidence inadmissible in spite of its relevance. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) General Principles of Relevancy, § 21.1, p. 485.)

■ Appellant contends evidence of respondent's right to FHA-authorized rental increases is not made inadmissible by the collateral source rule. Appellant argues the application of the collateral source rule to the facts of the instant case would make no sense inasmuch as respondent showed no foresight nor did it make any contribution toward its future security, two factors traditionally relied upon in support of application of the collateral source rule. Appellant further argues that the second condition where the collateral source rule is traditionally applied—the third party providing benefits is entitled to recover from the tortfeasor by virtue of a right of subrogation—is similarly lacking and thus, application of the collateral source rule is inappropriate. Arguing that the collateral source rule, when properly applied, prevents plaintiffs from receiving a windfall, appellant contends ". . . a gratuitous windfall—neither bargained for nor paid for, and devoid of subrogation—is precisely what [respondent] sought in the case at bench. Application of the collateral source rule to [respondent's] recovery would subvert the rule, not further it."

Respondent contends the FHA-authorized rental increases constitute "sources 'wholly independent' of the appellant and therefore [are] properly excluded under the collateral source rule." Respondent argues the "bene-

fits," in the form of increased rentals from the tenants, are not due to any efforts of appellant. Respondent further argues the collateral source rule is equally premised on basic notions of justice and that it would be unfair to permit a defrauding party to escape liability for damages by showing that the victim's tenants are paying increased rent. Finally, respondent suggests the restrictive FHA regulations imposed on an FHA borrower constitutes the " 'quid pro quo' which the FHA landlord pays for the favorable loan."

The collateral source doctrine in California is not based upon a specific statutory exclusion governing the admissibility of evidence pertaining to a plaintiff's receipt of collateral benefits. "Nevertheless, a pervasive public policy has been judicially expressed and California remains a firm proponent of the 'collateral source rule.' [Fn. omitted.] This doctrine provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].) The rule has been oft repeated to provide that where a person suffers property damage, the amount of damages shall not be reduced by the receipt by him of payment for his loss from a source wholly independent of the person who caused the injury. (*Hrnjak* v. *Graymar, Inc.*, *supra*, 4 Cal.3d 725, 729; *Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d 1, 6; *Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198].)

In *Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d 1, the Supreme Court undertook an extensive review of the collateral source doctrine and its purpose. The court firmly stated that considerations of policy are the basis of the rule: "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible sources of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Id.*, at p. 10.) The Supreme Court then addressed the objection that the rule provides plaintiff with an unjustifiable double recovery by noting the increasingly common provision in insurance policies

of subrogation or refund of benefits, a factor which appellant contends is not present in the instant case and therefore negates application of the rule herein. However, the Supreme Court noted that the collateral source rule is necessary and appropriate even in the absence of subrogation: "Even in cases in which the contract or the law precludes subrogation or refund of benefits, [fn. omitted] or in situations in which the collateral source waives such subrogation or refund, the rule performs entirely necessary functions in the computation of damages. For example, the cost of medical care often provides both attorneys and juries in tort cases with an important measure for assessing the plaintiff's general damages. [Citation omitted.] To permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict. [Citations omitted.]" (*Id.*, at pp. 11-12.) Further, the Supreme Court noted the collateral source rule serves the desirable function of helping to overcome the disadvantage to the plaintiff resulting from the usual attorney's contingent fee contract. Because the jury is not informed of the fact a large portion of the judgment goes to the attorney by virtue of the contingent fee and that the plaintiff seldom receives the full compensation computed by the jury, the collateral source rule serves to at least partially compensate for the attorney's share. (*Id.*, at pp. 12-13.) In summary, the Supreme Court stated: "We therefore reaffirm our adherence to the collateral source rule in tort cases in which the plaintiff has been compensated by an independent collateral source—such as insurance, pension, continued wages, or disability payments—for which he had actually or constructively . . . paid or in cases in which the collateral source would be recompensed from the tort recovery through subrogation, refund of benefits, or some other arrangement." (*Id.*, at pp. 13-14.)

The record in the instant case does not reveal any evidence of any right of subrogation, refund of benefits or any other arrangement which might reasonably be construed to fall within the general realm of subrogation. In *Helfend*, of course, the Supreme Court justified application of the rule in a case where the plaintiff has been compensated by an "independent collateral source" (2 Cal.3d at p. 13), citing insurance, pension benefits, continued wages, and disability payments as illustrative, but not exclusive, examples of a collateral source. The thrust of respondent's analysis in the instant case is that rental increases, which must be authorized by the FHA pursuant to the loan regulations, constitute a collateral source analogous to insurance or disability benefits. Respondent also argues the purchaser of an FHA-financed facility in effect constructively pays for the benefits he receives by virtue of the favorable loan and the possibility of rental increases through submission to FHA regulations. John Hamilton, an expert real es-

tate appraiser called as a witness by appellant, testified that in preparing to appraise the Novato complex he examined, inter alia, the FHA loan and financing documents and the regulatory provisions contained therein. He testified that a purchaser would look at the restrictions on rental increases together with the fact the prevailing rental rates for the complex were lower than the market rates and consider these factors in evaluating the property. The appraiser was also permitted to testify that in forming his opinion as to the value of the property he took into consideration the possibility of recapturing expenses made in connection with roof repairs through FHA-authorized rental increases, and that a reasonable buyer would consider the factor he would not have to take costs out of his own pocket but rather could pass them on to his renters. Appellant's appraiser testified to construction conditions and restrictions a buyer assumed when purchasing an FHA-financed project:

"Q. [Mr. Thuesen, respondent's counsel] And that's the quid pro quo, that the person pays for that cheap loan, isn't it? That is, you cannot do what you want with these rents.

"A. [appraiser] Yes, you are giving up something to get this $100,000 a year break in interest rate, yeah.

"Q. And one of the things you give up is the right to set your own rent.

"A. That's true.

"Q. And in order to change the rent you have to make an application to HUD.

"A. Yes.

". . . . . . . . . . . . . . . . . . . .

"A. You are always a little bit behind because you are working on an— expenses that have happened more in the past, so that's one of the things that keeps the rental rates a little below the market is the fact you can't increase them as fast as expenses increase."

The financing arrangement to which the Novato complex is subject is an "FHA 207 loan." Technically, the financing arrangement is an insured mortgage pursuant to 24 Code of Federal Regulations, section 207. The

federal regulations impose upon every insured mortgage, multifamily housing project many restrictions.[3]

Additionally, the federal regulations impose restrictions on occupancy, property use, and prohibit racial discrimination. (24 C.F.R. §§ 207.19, 207.20, 207.21.)

We interpret the restrictive and regulative FHA insured mortgage as equivalent to "constructive" payment or investment by the mortgagor (respondent in this case) in a program with potential collateral benefits or compensation (i.e., favorable interest rate and compensation for increased operating costs via increased rentals). ▮ Most jurisdictions, including California, have balanced the conflicting principles of tort law brought to a focus by the collateral source rule—that of compensating the plaintiff only for those losses actually sustained versus avoiding a "windfall" to the defendant by granting to him a credit for the reasonable value of collateral benefits received by the plaintiff—in favor of excluding evidence of "benefits" received by the plaintiff from a source wholly independent of and collateral to the tortfeasor. (See *Yarrington* v. *Thornburg* (1964) 58 Del. 152 [205 A.2d 1, 11 A.L.R.3d 1110]; *City of Marion* v. *Flanary* (Ky.App.

---

[3]Among the restrictions applicable to a 207 loan at the time of the negotiations and sale between the parties are the following found in 24 Code of Federal Regulations, section 207.19(e):

"(e) *Rents and charges.* No charge shall be made by the mortgagor for the accommodations, facilities or services offered by the project in excess of those approved by the Commissioner in writing prior to the opening of the project for rental. In approving such charges and in passing upon applications for changes, consideration will be given to the following and similar factors:

"(1) Rental income necessary to maintain the economic soundness of the project.

"(2) Rental income necessary to provide reasonable return on the investment consistent with providing reasonable rentals to tenants.

"(f) *Methods of operation.*

"(1) [Reserved]

"(2) The mortgagor shall maintain its project, the grounds, buildings, and equipment appurtenant thereto, in good repair and will promptly complete necessary repairs and maintenance as required by the Commissioner.

"(3) In all projects, except those involving rehabilitation where the mortgage does not exceed $200,000, a fund for replacements shall be established and maintained with the mortgagee. The amount and type of such fund and the conditions under which it shall be accumulated, replenished, and used, shall be specified in the charter, trust agreement, or regulatory agreement.

"(4) The mortgagor, its property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and papers shall be subject to inspection and examination by the Commissioner or his duly authorized agent at all reasonable times.

"(5) The mortgagor shall execute and deliver to the Commissioner a certificate that the books and accounts of the mortgagor will be established and maintained in a manner satisfactory to the Commissioner on the date the certificate is executed. . . ." The wording of 24 Code of Federal Regulations, section 207.19(e) has since been changed in a manner not relevant herein and which does not change the basic effect of the regulation.

1959) 324 S.W.2d 803; *Thomas* v. *Paper Haulers, Inc.* (La.App. 1964) 165 So.2d 61; *Royer* v. *Eskovitz* (1960) 358 Mich. 279 [100 N.W.2d 306, 2 A.L.R.3d 286]; *Dahlin* v. *Kron* (1950) 232 Minn. 312 [45 N.W.2d 833]; *Pritt* v. *Terminal R. R. Ass'n. of St. Louis* (Mo. 1952) 251 S.W.2d 622; *Rigney* v. *Cincinnati Street Railway Co.* (1954) 99 Ohio App. 105 [58 Ohio Ops. 202, 131 N.E.2d 413, 52 A.L.R.2d 1443]; *Patusco* v. *Prince Macaroni, Inc.* (1967) 50 N.J. 365 [235 A.2d 465]; *Powers* v. *Temple* (1967) 250 S.C. 149 [156 S.E.2d 759]; *Stone* v. *City of Seattle* (1964) 64 Wn.2d 166 [391 P.2d 179].) The principle has also been applied to refuse the admission of evidence of indirect benefits received by the plaintiff, including income tax savings or the fact plaintiff's expenses were decreased during hospitalization. (22 Am.Jur.2d (1965) Damages, § 206, p. 287.)

■ Appellant contends the absence of a right of subrogation or refund in the instant case will operate to confer upon respondent a windfall and defeat the basic compensatory purpose of tort damages. However, the real issue is not whether a windfall is to be conferred upon either party, but rather which party shall receive the benefit of a windfall which presumably already exists. As between the insured plaintiff and the tortfeasor, it would seem that justice compels the conclusion the former's claim is the better. (See *Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at pp. 11-12.) In any event, it is clear the possibility of a double recovery in favor of respondent will not impose a double burden on appellant; appellant, as tortfeasor, bears responsibility only for the single burden of his wrong. Further, it is doubtful whether respondent may even receive a double recovery under the restrictive federal regulations pertaining to the insured mortgage. As noted above, the Federal Housing Commissioner was required to consider, inter alia, these factors in approving or denying an application for a rental increase: "(1) Rental income necessary to maintain the economic soundness of the project.

"(2) Rental income necessary to provide reasonable return on the investment consistent with providing reasonable rentals to tenants." (24 C.F.R. § 207.19(e).) In view of the strict regulations governing FHA-insured mortgages, and the strict scrutiny to which the financing between the mortgagor (respondent) and FHA is subjected, it is reasonable to assume the Federal Housing Commissioner would deny a rental increase in the face of a large judgment received by the mortgagor attributable to the damages for which he seeks rental increases.

■ It is unclear from the record in the instant case whether respondent did in fact receive authorization from FHA to increase rentals. In the course of discussion between counsel and the court pertaining to the disputed evi-

dence, it is unclear whether appellant proposed to offer evidence that respondent could, if it chose to, apply for a rental increase, had in fact already applied for a rental increase, or had received authorization to actually increase rentals. During the course of this argument, counsel for appellant implied the evidence he wished to produce would establish that respondent had in fact received permission to raise rents. However, the record is ambiguous on this point. The argument of counsel for respondent also suggests there was only the availability of an application for a rental increase and not an existing authorization to raise rentals. Given the lack of clarity in the record, it cannot be said with certainty that respondent has actually received authorization to increase rentals and that a subsequent judgment against appellant would constitute a windfall double recovery. It is in this respect, at least, that appellant's offer of proof below is deficient as suggested by respondent. (See Evid. Code, § 354.)[4]

■■■ The authority for the regulations pertaining to section 207 guaranteed mortgages is 12 United States Code sections 1713, 1715b.[5] These sections are part of the National Housing Act, 12 United States Code section 1701 et seq., and are located in the subchapter on Mortgage Insurance, 12 United States Code section 1707 et seq. A review of the relevant statutes reveals a legislative intent to facilitate and encourage the provision of low-cost rental housing. Title 12 United States Code section 1713(b) governing rental housing insurance provides, in part: "The insurance of mortgages under this section is intended to facilitate particularly the production of rental accommodations, at reasonable rents, of design and size suitable for family living. The Secretary is, therefore, authorized and directed in the administration of this section to take action, by regulation or otherwise, which will direct the benefits of mortgage insurance hereunder primarily to those projects which make adequate provision for families with children, and in which every effort has been made to achieve moderate rental charges." Title 12 United States Code section 1701t sets forth more specifically the intent of the Congress: "The Congress affirms the national goal, as set forth in section 1441 of Title 42, of 'a decent home and a suitable living environment for every American family'.

[4]Respondent contends appellant's offer of proof below was deficient, particularly with regard to appellant's election not to present FHA records which clarified the FHA rules. However, this court is required to take judicial notice of the relevant provisions of the Code of Federal Regulations cited above (Evid. Code, §§ 451, subd. (b), 459; see comment, Assembly Committee on Judiciary, Deering's Ann. Evid. Code, § 451 (1966) pp. 525-527), which adequately apprise this court of the criteria utilized by the Commissioner of Federal Housing in determining whether to approve an application for a rental increase under a section 207 guaranteed mortgage.

[5]12 United States Code section 1715b provides: "The Secretary is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter."

"The Congress finds that this goal has not been fully realized for many of the Nation's lower income families; that this is a matter of grave national concern; and that there exist in the public and private sectors of the economy the resources and capabilities necessary to the full realization of this goal.

"The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves, and of other Government programs designed to assist in the provision of housing for such families, the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality; and in the carrying out of such programs there should be the fullest practicable utilization of the resources and capabilities of private enterprise and of individual self-help techniques." (See also *Angleton* v. *Pierce* (D.N.J. 1983) 574 F.Supp. 719 [court interpreted Act to indicate particular wish of Congress to encourage production and provision of below-income and moderate-income housing].)

With respect to projects subject to federal mortgage insurance and intended to provide low and moderate-income housing, rental increases unrelated to normal economic and market conditions would frustrate the goals of Congress as embodied in the foregoing legislation. In other words, to allow a fraudulent tortfeasor, as in the instant case, to benefit from the fact the victim may be able to receive FHA approval to increase rentals is contrary to the policy of providing as affordable housing as possible to deprived Americans. As between a tortfeasor and innocent tenants of insured mortgage housing, the latter certainly possess the superior equities. To permit the tortfeasor to bring in evidence of the victim's capacity to apply for rental increases in order to mitigate damages will help ensure that the innocent tenant will ultimately bear the burden of higher housing costs, rather than encouraging recovery of costs in the form of a civil judgment against the tortfeasor.

A review of the arguments presented by counsel for appellant before the trial court below suggests that a major thrust of appellant's argument was that appellant's expert appraiser be permitted to testify regarding the conditions of the FHA-insured mortgage as far as they affected the fair market value of the property in question. On this point the trial court agreed with appellant and ruled that appellant's appraiser may testify regarding the possibility of application for increased rentals as well as the other FHA regulations as these factors pertain to the expert opinion of property value. To the extent appellant would choose to offer evidence of application for and/or receipt of actual authorization for increased rentals from FHA, the trial

court ruled against admission of this evidence. The trial court's exclusion ruling was correct under the collateral source rule. ■ If evidence is excluded on an improper objection but the evidence excluded is subject to objection on a different ground, it does not matter that the reason advanced by counsel or relied upon by the court was wrong. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 260, p. 267, citing *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 330 [48 P. 117]; see also *Smith* v. *Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259, 267 [147 Cal.Rptr. 1].) If the exclusion is proper upon any theory of law applicable to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision. (*Davey* v. *Southern Pacific Co., supra,* 116 Cal. at p. 329; *Smith* v. *Walter E. Heller & Co., supra,* 82 Cal.App.3d at p. 267.) Having sustained the exclusion, we need not address other theories of exclusion.

II.*

Is RESPONDENT ENTITLED TO CORRECTION OF THE VERDICT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 43.

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Franson, Acting P. J., and Hanson (P. D.), J., concurred.

*See footnote on page 159, *ante.*