[No. A063705. First Dist., Div. Three. Sept. 9. 1994.]

PACIFIC GAS AND ELECTRIC COMPANY, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
THOMAS B. ALLEN et al., Real Parties in Interest.

**COUNSEL**

Howard V. Golub, J. Michael Reidenbach, Richard L. Meiss and Stephen L. Garber for Petitioner.

No appearance for Respondent.

Stewart, Stewart & O'Neil, Thomas N. Stewart III, Bold, Polisner, Maddow, Nelson & Judson, Jeffrey D. Polisner, Carl P. A. Nelson, Simpson & Gigounas, Edward B. Simpson, John Gigounas and James H. Ross for Real Parties in Interest.

**OPINION**

**WHITE, P. J.—** ◼ The "collateral source rule" provides that where a person "suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer. . . ." (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198], citations omitted.) This petition asks whether a

particular insurance source is "wholly independent" of the wrongdoer within the meaning of the rule.

Pacific Gas and Electric Company (PG&E) received $1 million in settlement from National Union Fire Insurance Company (National Union) because of a National Union "fidelity" policy insuring PG&E against losses due to employee dishonesty. The superior court, finding the source of the payment not "wholly independent," concluded nonemployees who allegedly conspired with an employee in defrauding PG&E may take a $1 million credit for PG&E's settlement. We hold the collateral source rule applies to this situation and bars credit. We direct issuance of a peremptory writ of mandate.

## Facts and Procedures

The parties stipulated below to the following facts: PG&E has sued its former employee Michael Salazar and real parties in interest Thomas B. Allen, Glen A. Swafford and others[1] for conspiring to defraud PG&E in the administration of its Fallout Claims Program. The Fallout Claims Program was set up to respond to complaints from neighbors downwind from two PG&E power plants. Under the program, PG&E would pay for washing and/or canvas covers for boats and other vehicles in nearby harbors, marinas and storage yards. Salazar was the investigator for the Fallout Claims Program. Allen and Swafford are contractors who provided washing services or canvas covers or both. PG&E alleges they conspired with Salazar through various schemes to bilk PG&E out of money.

PG&E, having paid nearly $500,000 in premiums for fidelity bonds over a three-year period, sent proof of loss to National Union, claiming loss of $3 million. PG&E also filed an action against National Union in federal court. National Union, in turn, filed a "third party complaint" for declaratory relief against Allen, Swafford, Salazar, and others. PG&E and National Union entered into a settlement under which National Union paid PG&E $1 million, dismissed its third party complaint with prejudice, and waived its subrogation rights under the fidelity bonds.

At the request of the parties, the court heard the collateral source issue as "phase one" of the trial of PG&E's damage action against Allen, Swafford, and others. The court granted the requests of Allen and Swafford for credit.

---

[1]For convenience, the various people and entities related to Thomas B. Allen and represented by the same attorneys, including Barbara Lennier, also known as Barbara Allen, Delta Canvas and Marine Products, Inc., Delta Yacht Cleaning, Delta Yacht Sales, and Delta Auto Detailing, are referred to as "Allen." Similarly, Glen A. Swafford and Swafford Storage are referred to as "Swafford."

This petition followed. We issued an alternative writ because we agree with PG&E and Allen's assertions that resolution of this issue prior to trial could be very beneficial to the case.

## The Collateral Source Rule

"The Supreme Court of California has long adhered to the doctrine that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor. [Citation.] As recently as August 1968 we unanimously reaffirmed our adherence to this doctrine, which is known as the 'collateral source rule.' [Citations.] [¶] Although the collateral source rule remains generally accepted in the United States, nevertheless many other jurisdictions have restricted or repealed it. In this country most commentators have criticized the rule and called for its early demise. In *Souza* [*City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217 (57 Cal.Rptr. 337, 424 P.2d 921)] we took note of the academic criticism of the rule, characterized the rule as 'punitive,' and held it inapplicable to the governmental entity involved in that case." (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6-7 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398], fns. omitted.)

In *Helfend*, the court distinguished *Souza* and applied the collateral source rule to permit plaintiff to recover from the negligent transit company for medical expenses already paid for under plaintiff's Blue Cross medical insurance coverage. (*Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at pp. 5-6.) "Here plaintiff received benefits from his medical insurance coverage only because he had long paid premiums to obtain them. Such an origin does constitute a completely independent source . . . . [¶] The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence. [¶] The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit . . . ." (*Id.*, at pp. 9-10, fn. omitted.)

## Source of Payment

The superior court here explained its refusal to apply the collateral source rule: "The collateral source rule does not apply to the fidelity bond payment with respect to defendants Allen and Swafford. The $1 Million received by PG&E from its fidelity bond insurer was paid only because of the fraud of former PG&E employee Michael Salazar. Any fraud, if any, committed by Salazar was committed by him as a joint tortfeasor with either Allen or Swafford. As such, the Court finds that the payment received by PG&E from its fidelity bond carrier was not from a source 'wholly independent' of Salazar."

■ We conclude the court confused the triggering event for insurance coverage with the source of the collateral benefit provided by insurance. While Salazar's actions may have been a necessary condition to payment under the fidelity policy, the source of the payment was wholly independent of Salazar, Allen and Swafford, who did not pay premiums for the policy either directly or constructively.

A recent note analyzing the collateral source rule observed that its application "often depends upon the source of the collateral benefits, which can be divided into three categories: payments from the plaintiff's automobile, medical, or life insurance company; plaintiff's workers' compensation coverage provided through his employer; and a third party who gratuitously conferred collateral benefits upon the plaintiff, such as free medical care from a physician." (Note *California's Collateral Source Rule and Plaintiff's Receipt of Uninsured Motorist Benefits* (1986) 37 Hastings L.J. 667, 672-673, fn. omitted [hereafter *Collateral Source Rule*].) The author concluded that payment from the plaintiff's insurance company presents the strongest case for application of the rule. Application of the rule is "supported by two public policy rationales: favoring the injured party over the culpable tortfeasor and encouraging the public to purchase insurance benefits." (*Id.*, at p. 674, fns. omitted.)[2]

The justification is less strong when the collateral source is workers' compensation benefits because the employee plaintiff has not directly contributed to the workers' compensation fund. "Nevertheless, the employee

---

[2] See also *Maggio, Inc.* v. *United Farm Workers* (1991) 227 Cal.App.3d 847, 877 [278 Cal.Rptr. 250], where the collateral source was a growers' strike damage fund, treated by the court the same as insurance.

constructively pays for the benefits through his labor." (*Collateral Source Rule, supra,* 37 Hastings L.J. at p. 675, fn. omitted.)[3]

The justification is weakest when the benefits are provided gratuitously, such as by free medical care. However, in California even those benefits are subject to the collateral source rule. (*Collateral Source Rule, supra,* 37 Hastings L.J. at p. 676; *Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632, 637 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]; *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 662 [151 Cal.Rptr. 399].)

The most obvious examples of sources *not* considered wholly independent of the tortfeasor are a cotortfeasor and a cotortfeasor's insurance carrier. (*Kardly* v. *State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479, 485 [255 Cal.Rptr. 40]; *Krusi* v. *Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 673-674 [192 Cal.Rptr. 793].) The superior court's reference to joint tortfeasors in this case suggests the court may have focused on these examples and treated National Union's payment as if it were from Salazar's insurance carrier. There is no evidence, however, that Salazar participated in any way in the purchase of the National Union policy.

PG&E purchased the National Union policy to protect itself from the acts of employees like Salazar. This fact does not convert the policy into Salazar's insurance policy. PG&E's prudence in purchasing the policy is not undone by occurrence of the very events for which PG&E sought protection. If, as suggested by the superior court, an employee's dishonesty, the triggering event for coverage, deprives PG&E of the proceeds of the policy, the policy is of limited value. Furthermore, if Allen and Swafford, who may have pocketed the proceeds of fraud, were permitted to retain some of these proceeds because National Union has compensated PG&E, public policy considerations would be turned upside down.

Allen and Swafford, relying upon *Waite* v. *Godfrey* (1980) 106 Cal.App.3d 760 [163 Cal.Rptr. 881], contend the collateral source rule does not apply because this case involves joint tortfeasors. The general rule is that each joint tortfeasor is jointly and severally liable for the entire judgment, but each is entitled to credit for payments made by or on behalf of every

---

[3]In *Philip Chang & Sons Associates* v. *La Casa Novato* (1986) 177 Cal.App.3d 159 [222 Cal.Rptr. 800], the court applied the constructive payment approach in another context. Defendant in an action for fraud in the sale of an apartment complex sought to reduce damages because the buyer was permitted by Federal Housing Administration (FHA) regulations to apply to recoup losses through rent increases. The *Philip Chang* court concluded plaintiff constructively paid for the possibility of rent increases by submitting to the burdens of FHA regulation and could therefore treat any rent increases as payment from a collateral source. (*Id.,* at pp. 169-172.)

other joint tortfeasor. (Code Civ. Proc., § 875; *Laurenzi* v. *Vranizan* (1945) 25 Cal.2d 806, 813 [155 P.2d 633]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 48, 56-57, pp. 110, 116-117.) Allen and Swafford contend they should receive credit for the payments made by Salazar's employer's insurance just as they would receive credit if Salazar or Salazar's insurance paid a judgment. They assert the source of this payment is not independent of the tortfeasor within the meaning of the collateral source rule.

In *Waite*, plaintiff's car was the fourth in a chain reaction collision started by a hit-and-run driver. Plaintiff's insurer paid plaintiff $12,000 under her uninsured motorist coverage and a jury awarded her $20,000 from the defendants. The issue before the *Waite* court was whether these defendants should be given credit for the $12,000 paid under plaintiff's uninsured motorist coverage.

*Waite*, using suspect analysis and ill-considered dicta (see *Collateral Source Rule, supra,* 37 Hastings L.J. at pp. 685-686, 688, 692; *Kardly* v. *State Farm Mut. Auto. Ins. Co., supra,* 207 Cal.App.3d 479, 487), concluded the collateral source rule did not apply. *Waite* narrowly characterized the *Helfend* issue as whether the collateral source rule could be applied where a defendant was a public entity and then bypassed *Helfend*'s comprehensive explanation of the rule and reasons it applies when a plaintiff has recovered under his or her own insurance policy. Instead *Waite* focused its analysis on *De Cruz* v. *Reid* (1968) 69 Cal.2d 217 [70 Cal.Rptr. 550, 444 P.2d 342], an application of the collateral source rule in the significantly different workers' compensation context, where the employer, who might become a defendant, purchases the insurance. *Waite* noted that its facts were different from those in *De Cruz* because in *De Cruz* the employer was not a joint tortfeasor. *Waite* speculated, based on *De Cruz* dicta, that the *De Cruz* court would have found the collateral source rule inapplicable to *Waite*'s facts because they involved joint tortfeasors. (*Waite* v. *Godfrey, supra,* 106 Cal.App.3d, at pp. 766-768.)

By comparing its case to one where a potential defendant's insurance would compensate the plaintiff, *Waite* changed the focus from who paid for the insurance to whose acts triggered coverage by the policy. The court concluded the settlement of $12,000 "represented only a payment made on the occasion of damage inflicted by another joint tortfeasor, i.e., another wrongdoer besides defendants, regardless of what carrier was the source of the payment. As such, it represents a particular occasion for application of the concept embodied in section 877 of the Code of Civil Procedure which requires a setoff for such payments to reduce the damages exposure of the other tortfeasors." (*Waite* v. *Godfrey, supra,* 106 Cal.App.3d at p. 772.)

*Waite* failed to satisfactorily explain how it could suddenly disregard whose carrier was the source of the payments, the key point in determining if the source was collateral.

In the midst of its otherwise questionable analysis, *Waite* made one point which might justify its departure from the general principles of the collateral source rule. The *Waite* plaintiff's purchase of uninsured motorist coverage probably was not due to foresightedness. Insurance Code section 11580.2 required her bodily injury motor vehicle liability insurance policy include uninsured motorist coverage. (*Waite* v. *Godfrey*, *supra*, 106 Cal.App.3d at pp. 770-771.) Thus, *Waite*'s failure to apply the collateral source rule probably has not discouraged the purchase of insurance.

If *Waite* is sound law, it is not persuasive here. Allen and Swafford do not claim PG&E was compelled by state law to purchase fidelity insurance. Therefore, they qualify as tortfeasors seeking to "garner the benefits of [their] victim's providence." (*Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at p. 10.)

Swafford, minimizing his alleged conspiracy with Salazar, contends PG&E sought protection only from Salazar's dishonesty, not from theft by coconspirators. However, National Union's policy provided protection from whatever damages a dishonest employee might cause "acting alone or in collusion with others," not merely from those the employee might cause alone. The collateral source rule applies to this situation.

### Assignment of Subrogation Rights

■ The superior court provided an additional reason for allowing Allen and Swafford credit: "Plaintiff PG&E could have taken an assignment from National Union, its fidelity bond carrier, and thereby pursued 100% (one hundred percent) of the claim against Allen and Swafford. Part of the PG&E's settlement with National Union required the dismissal of National Union's third-party action in U.S. Federal Court with prejudice against Allen and Swafford. That third-party action was dismissed with prejudice for a waiver of costs by Allen and Swafford. For reasons unknown, PG&E did not seek an assignment of National Union's claim."

The disposition of subrogation rights is important because of symbiosis between the collateral source rule and subrogation rights. The strongest objection to the collateral source rule, that it may permit a " 'double recovery' " by plaintiff, has been weakened by the prevalence of subrogation provisions in insurance policies. (*Helfend* v. *Southern Cal. Rapid Transit*

*Dist., supra,* 2 Cal.3d, at p. 10.) Where a subrogation provision exists, an insurer may recoup its payments directly from the tortfeasor or from the proceeds of the insured's action against a tortfeasor. (*Collateral Source Rule, supra,* 37 Hastings L.J. at pp. 692-693.) "Hence, the plaintiff receives no double recovery; the collateral source rule simply serves as a means of by-passing the antiquated doctrine of non-assignment of tortious actions and permits a proper transfer of risk from the plaintiff's insurer to the tortfeasor by way of the victim's tort recovery. The double shift from the tortfeasor to the victim and then from the victim to his insurance carrier can normally occur with little cost in that the insurance carrier is often intimately involved in the initial litigation and quite automatically receives its part of the tort settlement or verdict." (*Helfend, supra,* at p. 11, fns. omitted.)

Swafford admits that PG&E or National Union or both could sue Allen and Swafford, who could themselves require joinder in order to prevent multiple lawsuits and double liability. Swafford contends, however, that PG&E's settlement with National Union and National Union's subsequent dismissal of Allen and Swafford with prejudice bars both National Union and PG&E from prosecuting actions for recovery of the $1 million previously sought by National Union. Swafford argues the dismissal with prejudice is res judicata and bars prosecution of the same claim by PG&E in another action.

Additionally, both Allen and Swafford argue that National Union's waiver of subrogation rights prior to paying PG&E and prior to dismissing its complaint against Allen and Swafford has not transferred the subrogation rights to PG&E. This is so, they claim, because the waiver was secret. The waiver was equivalent to an assignment of an obligee's rights, which would not be effective until the obligor was given notice. Therefore, when they agreed to waive costs in exchange for National Union's dismissal of unassigned subrogation rights, Allen and Swafford received in return the $1 million credit National Union otherwise could have assigned to PG&E.

The superior court's reasoning and the arguments of Allen and Swafford are perplexing. PG&E's rights against Allen and Swafford stem not from National Union but from the torts allegedly committed by Allen and Swafford. National Union's rights against Allen and Swafford, if any, would stem from PG&E. Only upon paying benefits to PG&E would National Union be subrogated to PG&E's rights against Allen and Swafford.

National Union simultaneously agreed to pay $1 million and to waive any right to subrogation that would otherwise have arisen from payment of the insurance policy proceeds. National Union's waiver of these inchoate subrogation rights left PG&E free to pursue Allen and Swafford for PG&E's

own benefit, releasing PG&E from the obligation to share proceeds with National Union. National Union never obtained subrogation rights. PG&E did not lose rights it possessed from the time of the loss by failing to secure an assignment from National Union of prospective rights or by failing to inform Allen and Swafford of the waiver of prospective rights.

*De Cruz* v. *Reid, supra,* 69 Cal.2d at pages 223, 227, states clearly that a waiver of subrogation rights inures to the benefit of the injured party, not the tortfeasor. (Cf. *Philip Chang & Sons Associates* v. *La Casa Novato, supra,* 177 Cal.App.3d, at p. 170 [double recovery and absence of subrogation do not prevent operation of the collateral source rule].) National Union's waiver of subrogation rights was a business decision which probably reduced the amount of the settlement with PG&E. (See *Shaffer* v. *Debbas* (1993) 17 Cal.App.4th 33, 40-41 [21 Cal.Rptr.2d 110].) PG&E, not Allen and Swafford, will reap the benefit.

The superior court erred in authorizing credit for Allen and Swafford. Let a peremptory writ of mandate issue directing the Contra Costa County Superior Court to vacate its order refusing to apply the collateral source rule and to enter a new order applying the rule.

Merrill, J., and Jenkins, J.,* concurred.

The petitions of real parties in interest for review by the Supreme Court were denied December 22, 1994. Baxter, J., did not participate therein.

---

*Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judicial Council.